**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIANE MURPHY and MEGAN MURPHY, on behalf of themselves and all others similarly situated,<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>NCL (BAHAMAS) LTD. D/B/A NORWEGIAN CRUISE LINE; and NORWEGIAN CRUISE LINE HOLDINGS LTD.,<br><br><div align="center">Defendants.</div> | Case No. 1:21-cv-02211<br><br>**<u>CLASS ACTION COMPLAINT</u>** |

## I.      INTRODUCTION

1.      When the *Norwegian Bliss* cruise ship departed for a seven-day cruise from New York, New York to the Bahamas on March 8, 2020, the novel coronavirus was spreading rapidly across the globe, setting the stage for a cruise that would be anything but blissful for the estimated 4,000 passengers on board. Little did the travelers know, in mere weeks, their port of departure was to be the epicenter of the coronavirus for the entire country, if not the world.

2.      Given the close quarters occupied by cruise travelers from many different locations, the cruise industry was especially affected by the rapid spread of the virus. With highly-publicized outbreaks aboard other vessels and the industry's knowledge regarding the spread of contagion aboard cruise ships, NCL (Bahamas) Ltd. ("NCLB"), and its parent company, Norwegian Cruise Line Holding Ltd. ("NCLH") (collectively, "Norwegian")—the third-largest cruise line in the world—were well aware of the potential for the spread of COVID-19 aboard their vessels. Indeed, before the *Norwegian Bliss* departed port, at least three other cruise vessels, owned and operated by Norwegian's rivals, reported significant outbreaks aboard.

3.      Despite the known dangers to passengers and the public posed by departing in the midst of a pandemic, passengers on the *Norwegian Bliss* were denied the chance to get their money back, leaving them no choice but to risk their health and safety onboard or forfeit the money they paid for the cruise.

4.      Notwithstanding its knowledge of the dangers presented by cruising in the midst of a pandemic, Norwegian sailed on, putting thousands of passengers and employees in danger, to say nothing of the general public. As the Wall Street Journal reported, "[e]arly in March, the world's cruise-ship operators had ample evidence to believe their fleet of luxury liners were incubators for the new coronavirus. Yet they continued to fill cruise ships with passengers, endangering those aboard and helping spread C[OVID]-19 to the U.S. and around the globe[.]"[1] The world knows all too well the steep cost to passenger and public health and safety caused by the cruise industry conducting business as usual in a time that is anything but usual.

5.       Plaintiffs Diane Murphy and Megan Murphy, on behalf of themselves and all others similarly situated, two passengers aboard the *Norwegian Bliss*, bring this action against Norwegian.

## II.    JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1333(1). This action arises from a maritime tort on a cruise originating from and terminating in this district. Pursuant to 28 U.S.C. § 1333(1), the district courts shall have original jurisdiction over any civil action of maritime or admiralty jurisdiction.

---

[1] Jacquie McNish et al., *Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew*, Wall St. J. (May 1, 2020, 11:21 AM), https://www.wsj.com/articles/cruise-ships-set-sail-knowing-the-deadly-risk-to-passengers-and-crew-11588346502.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) and (C), the Class Action Fairness Act of 2005 ("CAFA"). Plaintiffs Diane and Megan Murphy's claims exceed $5,000,000; they are citizens of Pennsylvania; and citizens of a different state from at least one Defendant.

8.      This Court has personal jurisdiction over each of the Defendants and venue is proper in this district because NCLB conducts substantial business within this district, including operating maritime cruise vessels originating from and terminating in this district. NCLH is authorized to conduct substantial business within this district, including but not limited to through its wholly owned subsidiary NCLB.

### III.    THE PARTIES

9.      Plaintiff Diane Murphy is *sui juris*, and is a resident of Pennsylvania and was a passenger aboard the *Norwegian Bliss* cruise ship departing New York, New York on March 8, 2020.

10.     Plaintiff Megan Murphy is *sui juris*, and is a resident of Pennsylvania and was a passenger aboard the *Norwegian Bliss* cruise ship departing New York, New York on March 8, 2020.

11.     Defendant NCL (Bahamas) Ltd. d/b/a Norwegian Cruise Line is a for-profit, limited liability company incorporated in Bermuda with its principal place of business in Miami-Dade County, Florida.

12.     Defendant Norwegian Cruise Line Holdings Ltd. is a foreign holding company domiciled in Bermuda with its principal place of business in Miami-Dade County, Florida.

13.     Defendant Norwegian Cruise Line Holdings Ltd. is a leading global cruise company which operates and fully owns Norwegian Cruise Line, Oceania Cruises and Regent Seven Seas Cruises brands.

14.     Defendant Norwegian Cruise Line Holdings Ltd. owned, controlled, and did business through Norwegian Cruise Line, deriving substantial revenues from Norwegian cruises originating and terminating in various ports.

15.     On information and belief, both Defendants acted as owners, subsidiaries, affiliates, agents, apparent agents, alter egos, and/or assigns of each other and own and operate the vessel *Norwegian Bliss*.

## IV.     FACTUAL ALLEGATIONS

### A.     COVID-19 and the Danger of Viral Spread in Close Quarters

16.     In or around December 2019, a new strain of coronavirus was first detected in humans in Wuhan, China (the original COVID-19 epicenter).

17.     SARS-CoV-2, commonly known as COVID-19, is an extremely contagious disease caused by the novel coronavirus.

18.     Early studies indicate COVID-19 can take up to fourteen days from infection before manifesting in a wide range of symptoms, including fever and chills, muscle and body aches, fatigue, shortness of breath or difficulty breathing, allergy-like symptoms such as a sore throat and coughing, loss of taste, loss of smell, nausea and vomiting, diarrhea, organ damage like myocarditis, neurological deficits, and death.[2]

---

[2] *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Ctrs. for Disease Control & Prevention (updated Feb. 16, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

19.    Because it is novel, the symptoms associated with the virus, the long-term effects of it on the body, and its longevity are not well known. The "[l]ong-term sequelae [i.e., effects] of COVID-19 are unknown (as are many aspects of the acute disease)."[3] But clinicians do know that "[w]eeks and months after the onset of acute COVID-19, people continue to suffer."[4] For example, "Paul Garner, a professor of epidemiology at Liverpool School of Tropical Medicine, UK, wrote on the 95th day after the onset of symptoms that 'I am unable to be out of bed for more than three hours at a stretch, my arms and legs are permanently fizzing as if injected with Szechuan peppercorns, I have ringing in the ears, intermittent brain fog, palpitations, and dramatic mood swings.'"[5]

20.    Even after the acute symptoms of COVID-19 have dissipated and the patient had otherwise "recovered," clinicians have found abnormal cardiovascular MRIs in a high proportion of patients (78 of 100) and many patients reported dyspnoea (difficult or labored breathing) and unusual fatigue.[6] And "[t]hese patients are not only those recovering from the severe form of the acute disease ([i.e.], post intensive care syndrome), but also those who had mild and moderate disease."[7] This is consistent with the findings of other doctors who have treated young and otherwise healthy individuals who initially experienced mild or no symptoms and later had a stroke.[8]

---

[3] Dana Yelin et al., *Long-Term Consequences of COVID-19: Research Needs*, 20 The Lancet: Infection Diseases 1115, 1116 (2020), https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930701-5.
[4] *Id.* at 1115.
[5] *Id.* at 1115-16.
[6] *Id.* at 1116.
[7] *Id.*
[8] Ariana Eunjung Cha, *Young and Middle-Aged People, Barely Sick with COVID-19, are Dying of Strokes*, Wash. Post (Apr. 25, 2020, 11:12 AM), https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/.

21.     In sum, clinicians are just beginning to investigate the long-term effects of COVID-19, including whether it causes diabetes,[9] other metabolic disorders, and lung disease, among others.[10]

22.     As the world knows all too well at this point, COVID-19 can be fatal. The elderly and/or immunocompromised are particularly vulnerable to severe cases of COVID-19. It is important to note that cruise lines' most loyal and valuable passengers are often situated within this high-risk category.

23.     As of filing this Complaint, there have been more than 118 million confirmed COVID-19 cases worldwide and over 2.6 million global COVID-19 related deaths.[11]

24.     In the United States, the infection count has topped 29 million confirmed cases and more than 529,000 deaths and continues to rise, steadily.[12] The numbers of confirmed cases and death likely undercount the true number of cases and number of deaths caused by COVID-19.

25.     On January 30, 2020, the World Health Organization ("WHO") convened the IHR Emergency Committee, declaring COVID-19 a global public health emergency.[13] In the WHO's "Situation Report" released on the same day, the organization confirmed 7,736 total cases in China and 82 confirmed cases in 18 countries outside China, acknowledging a high rate of

---

[9] Francesco Rubino et al., *New-Onset Diabetes in COVID-19*, 383 New England J. of Med. 789, 789-90 (2020), https://www.nejm.org/doi/pdf/10.1056/NEJMc2018688?articleTools=true.

[10] *See* Yelin et al., *supra*, note 3, at 1116.

[11] *WHO Coronavirus (COVID-19) Dashboard*, World Health Organization, https://covid19.who.int/ (last visited Mar. 12, 2021).

[12] *COVID Data Tracker*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 12, 2021).

[13] *Listings of WHO's Response to COVID-19*, WHO (last updated Dec. 28, 2020), https://www.who.int/news-room/detail/29-06-2020-covidtimeline.

spread through person-to-person contact.[14] The organization determined a risk assessment as "[v]ery [h]igh" for China and "[h]igh" at a global level.[15]

26.    The severity and rate of spread for the novel coronavirus was known as early as January 2020. Although the impact of the novel coronavirus was mild for most of the United States in the months of January and February, it was well established from data in China and other early hotspots that the virus is highly contagious and spreads rapidly in close quarters through person-to-person contact.

27.    Due to the nature of COVID-19 and its ability to spread in close quarters, cruise ships are inherently prone to outbreaks. Indeed, cruise ships have always been vulnerable to the spread of disease and infection due to the nature of ships' crowded, enclosed- and semi-enclosed areas, the increased exposure to new environments, and limited medical resources.[16]

28.    Norwegian is aware of the heightened risk its operations pose for the spread of viruses. Even industry doctors have co-authored reports concerning the spread of "influenza and other respiratory viruses among ill crew members and passengers on select cruise ships."[17] After completing a three-year project, a 2017 report concluded the "high yield of positive results . . . reinforces the need to bolster influenza prevention and control activities on cruise ships."[18]

29.    Norwegian also knew there were substantial risks for those aboard the *Norwegian Bliss* specifically. Last year alone, the Centers for Disease Control and Prevention ("CDC")

---

[14] *Novel Coronavirus (2019-nCov): Situation Report - 10* at 1, WHO (Jan. 30, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200130-sitrep-10-ncov.pdf?sfvrsn=d0b2e480_2.

[15] *Id.*

[16] Kara Tardivel et al., *Cruise Ship Travel,* Ctrs. for Disease Control & Prevention, https://wwwnc.cdc.gov/travel/yellowbook/2020/travel-by-air-land-sea/cruise-ship-travel (last visited Mar. 12, 2021).

[17] Kimberly B. Rogers et al., *Laboratory-Based Respiratory Virus Surveillance Pilot Project on Select Cruise Ships in Alaska, 2013–15*, 24 J. Travel Med. 1, 1 (2017), https://academic.oup.com/jtm/article/24/6/tax069/4359870.

[18] *Id.*

found 45 violations during its inspections of the *Norwegian Bliss* as part of the Vessel Sanitation Program. The inspector encountered a crew member who, despite the "onset of acute gastroenteritis," continued to work, buckets made available to sanitize crew member hands that were "significantly cloudy and soiled," "black debris," a "soiled" refrigeration unit, and, because of the unsanitary conditions, a swimming "pool was closed immediately."[19]

30.     In short, prior to the appearance of COVID-19, NCLB and NCLH knew there was a substantial risk of transmitting viruses on their ships generally and on the *Norwegian Bliss* specifically.

31.     On January 27, 2020, experts in the European Union released their first version of guidelines to assist with the probable impact of COVID-19 on cruise ships.[20] The guidelines urged cruise companies to provide pre-travel information about the risks of COVID-19. In the event of a COVID-19 case aboard a cruise, the guidelines recommended close contacts of an infected person should be quarantined in their cabins or on shore, and "casual contacts" should disembark with active tracing and surveillance.[21]

32.     In early February 2020, Dr. Anthony S. Fauci, the United States top infectious disease expert, declared his concern for passengers and crew traveling on cruise ships: "People on a large ship, all together, at the same time, all the time — you couldn't ask for a better

---

[19] Inspection Detail Report for Cruise Ship *Norwegian Bliss*, Inspection Date Feb. 12, 2019, CDC, https://wwwn.cdc.gov/InspectionQueryTool/InspectionDetailReport.aspx?ColI=MTkzMDA3NDQ%3d-RGb0nFAtQAY%3d.

[20] *Advice for Ship Operators for Preparedness and Response to the Outbreak of Novel Coronavirus (2019-nCoV) Infection*, Healthy GateWays (Jan. 27, 2020), https://www.deutsche-flagge.de/de/redaktion/dokumente/dokumente-sonstige/3_eu_healthy_gateways_wuhan_outbreak_advice_maritime_27-1-2020-1.pdf.

[21] *Id.*

incubator for infection[.]"[22] Unfortunately, Norwegian did not heed these warnings, putting

thousands of passengers and the public directly in harm's way.

**B.    Defendants Knew of the Dangers Posed by Cruises in the Era of COVID-19**

33.    Outlined below is a timeline of events relevant to this action, with most events

predating the *Norwegian Bliss* voyage departure on March 8, 2020. In short, the timeline of

pertinent events demonstrates that Defendants had knowledge of the dangerous health and safety

risks associated with COVID-19 and the risk of it spreading within the confined quarters of a

cruise ship, yet decided to put profits from the *Norwegian Bliss* cruise above the health and

safety of passengers and the general public.

34.    By the time the *Norwegian Bliss* left the port of New York on March 8, 2020, the

deadly arc of a COVID-19 outbreak aboard a cruise vessel was clearly established. In early

February 2020, one of the first outbreaks of COVID-19 to capture global attention happened on

the *Diamond Princess*, a cruise ship owned by Carnival Corporation and operated by Princess

Cruise Lines. The outbreak originated while the ship was docked in Yokohama, Japan. Aboard

the *Diamond Princess* were 2,666 passengers and 1,045 crew members from a combined 56

countries.

35.    On February 1, 2020, Hong Kong's government confirmed that an 80-year-old

male passenger who had disembarked the *Diamond Princess* on January 25 tested positive for

COVID-19.[23] Ten more positive COVID-19 cases from the *Diamond Princess* were confirmed

around February 5, 2020.[24]

---

[22] David Leonhardt, *Why Did Cruise Ships Keep Sailing?*, N.Y. Times (Apr. 27, 2020),
    https://www.nytimes.com/2020/04/27/opinion/coronavirus-cruise-celebrity-eclipse.html.
[23] Eisuke Nakazawa et al., *Chronology of COVID-19 Cases on the Diamond Princess Cruise Ship and Ethical
    Considerations: A Report from Japan* at 1, Disaster Med. & Pub. Health Preparedness (2020),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7156812/.
[24] *Id.*

36.     Eventually, there were 712 cases and 14 deaths among passengers who had been aboard the *Diamond Princess*.[25]

37.     As thousands of passengers aboard the *Diamond Princess* found themselves confined to their small cabin rooms, passengers grew understandably restless. Some hung banners off the side of the ship, crafted out of cabin bedsheets and painted with pleas for help. One read: "Serious lack of medicine, lack of information."[26] Many crew members and staff aboard the *Diamond Princess* were rightfully scared for their lives.

38.     The *Diamond Princess* became the early test case, but the cruise industry failed to learn and move forward properly, and many more voyages suffered similar fates.

39.     On February 11, 2020, Carnival Corporation, Carnival plc, and Princess Cruise Lines Ltd. operated a "10-Night Mexican Riviera" roundtrip voyage from San Francisco to Mexico aboard the *Grand Princess*. On or around February 19, 2020, it was known that at least one passenger on this voyage was suffering from COVID-19 symptoms. This passenger, a man from Placer County, California, was hospitalized for persistent and severe symptoms. He later died on March 4, 2020, days before the *Norwegian Bliss* set sail.[27]

40.     Passengers boarding the *Grand Princess* for the next voyage to Hawaii were not notified of a likely COVID-19 case or made aware that passengers and crew from the previous leg to Mexico remained onboard for the journey to Hawaii. It was not until February 25, 2020 that Carnival and Princess emailed passengers that had traveled on the *Grand Princess* trip to Mexico alerting them that some of their fellow passengers had suffered from COVID-19

---

[25] Lauren Smiley, *27 Days in Tokyo Bay: What Happened on the Diamond Princess*, Wired (Apr. 30, 2020, 6:00 AM), https://www.wired.com/story/diamond-princess-coronavirus-covid-19-tokyo-bay/.

[26] Doug Bock Clark, *Inside the Nightmare Voyage of the Diamond Princess*, GQ (Apr. 30, 2020), https://www.gq.com/story/inside-diamond-princess-cruise-ship-nightmare-voyage.

[27] McNish et al., *supra*, note 1.

symptoms and that they may have been exposed. A health advisory was finally put into place on the *Grand Princess* on March 4, 2020; the advisory alerted passengers to the investigation of a "small cluster of COVID-19 (coronavirus) cases in Northern California connected to" the *Grand Princess* Mexico trip, and informed passengers of their potential exposure to the virus.[28]

41.    What Carnival and Princess characterized as a "small cluster," was in fact a "seeding" event, whereby "[r]eturn[ing] passengers . . . seeded outbreaks in countries including the United States."[29] By March 4—almost two weeks after the *Grand Princess* seeded the shores of California with a "small cluster of COVID-19 (coronavirus) cases"[30]—California was monitoring "some 9,400 people for the illness in 49 counties," and had confirmed 53 cases, including the death of one California man who had fallen ill aboard the *Grand Princess*.[31]

42.    Spurred by the COVID-19 outbreak on the *Grand Princess* and concern for general public health, California Governor Gavin Newsom declared a State of Emergency on March 4, 2020 to manage the spread in California.[32] When the *Grand Princess* returned from Hawaii, the State of California refused to allow it into the port of San Francisco, forcing the ship to anchor off the coast. Governor Newsom stated at a press conference that there were 11 passengers and 10 crew members experiencing symptoms.[33] "Ultimately, more than 130 people

---

[28] Dr. Grant Tarling, *Guest Health Advisory – Coronavirus*, Princess (Mar. 4, 2020), https://www.princess.com/news/notices_and_advisories/notices/grand-princess-updates.html.

[29] Smriti Mallapaty, *What the Cruise-Ship Outbreaks Reveal About COVID-19*, Nature (Mar. 26, 2020), https://www.nature.com/articles/d41586-020-00885-w.

[30] Tarling, *supra*, note 28.

[31] Joe Vasquez, *Newsome Declares State of Emergency Amid Coronavirus Spread, Blocks Cruise Ship from SF Port*, CBS SF BayArea (Mar. 4, 2020, 9:38 PM), https://sanfrancisco.cbslocal.com/2020/03/04/california-gov-newsom-declares-state-of-emergency-amid-coronavirus-spread-1st-death-in-state/.

[32] *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*, CA.gov (Mar. 4, 2020), https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.

[33] Victoria Colliver, *California Declares Coronavirus State of Emergency, Orders SF-Bound Cruise Ship to Remain in the Pacific*, Politico (Mar. 4, 2020), https://www.politico.com/states/california/story/2020/03/04/california-declares-coronavirus-state-of-emergency-orders-sf-bound-cruise-ship-to-remain-in-pacific-1265473.

aboard the *Grand Princess* tested positive, and at least six have died, including five passengers and one crew member[.]"[34]

43.    A less publicized, but equally notable COVID-19 outbreak occurred aboard the *MS Westerdam*, operated by Holland America Line, a subsidiary of Carnival Corporation and Carnival plc, which departed from Hong Kong on February 1 for a 14-day cruise. Nobody was confirmed to have fallen ill with a COVID-19 infection on board, but the vessel struggled to find international port due to fear of outbreak.[35]

44.    After the *MS Westerdam* departed from Hong Kong on February 1, an emerging COVID-19 hotspot at the time, the vessel was denied port in Philippines, Japan, and Guam. Then, after initially receiving approval on February 10 to let passengers disembark in Thailand, permission to dock was refused the next day. On February 13, the ship was finally allowed to find port in Sihanoukville, Cambodia.

45.    Passengers aboard the *MS Westerdam* spent nearly two weeks at sea with complete uncertainty about when or where they might disembark. An American tourist on board stated, "[w]e've had so many near moments we thought we were going home only to be turned away."[36] When the vessel finally landed in Cambodia, "just seeing land was such a breathtaking moment."[37]

---

[34] Rosalind S. Helderman et al., *The Pandemic at Sea*, Wall St. J. (Apr. 25, 2020), https://www.washingtonpost.com/graphics/2020/politics/cruise-ships-coronavirus/.
[35] Jasmine Aguilera & Hillary Leung, *U.S. Cruise Ship Finally Docks in Cambodia After Being Denied Entry 5 Times over COVID-19 Fears*, Time (Feb. 12, 2020, 11:03 PM), https://time.com/5782129/cruise-ship-stranded-coronavirus-fears/.
[36] Prak Chan Thul, *Cruise Passengers Shunned over Coronavirus to Head Home After Cambodia Reprieve*, Reuters (Feb. 12, 2020, 5:02 PM), https://www.reuters.com/article/us-china-health-cambodia-cruiseship/cruise-ship-shunned-over-coronavirus-fears-arrives-in-cambodia-idUSKBN20702I.
[37] *Id.*

46.    Ships at sea have become virus hot spots. According to many health experts, the decision to keep sailing for weeks after the coronavirus was detected in early February was irresponsible in the extreme and contributed to the mounting toll of cases.[38]

**C.    Defendants Failed to Protect Passengers**

47.    The events that occurred on the *Diamond Princess*, *Grand Princess*, and *MS Westerdam* demonstrate Defendants' knowledge of the severity of COVID-19 and how it could spread quickly and fatally, ultimately impacting all cruise vessels. Although the *Grand Princess*, *Diamond Princess*, and *MS Westerdam* were owned and operated by Norwegian's competitors, the cruise industry was well aware of the events on those ships and the potential for disaster.

48.    Despite their knowledge, NCLB and NCLH failed to take reasonable and appropriate steps, including to: advise the Murphys and other proposed class members of the risks; comply with the CDC's Vessel Sanitation Program's Operations Manual; remedy past violations found by prior inspections conducted by the Vessel Sanitation Program; sanitize the ship before passengers boarded; screen passengers and crew members before boarding the *Norwegian Bliss*; provide personal protective equipment to passengers and crew members aboard the *Norwegian Bliss*; socially distance passengers and crew members; test passengers and crew aboard the *Norwegian Bliss* for COVID-19-like symptoms; quarantine or remove passengers or crew presenting with symptoms consistent with COVID-19; and allowing the *Norwegian Bliss* to depart on March 8, 2020.

49.    By allowing the *Norwegian Bliss* to depart on March 8, 2020, NCLB and NCLH ignored all warnings that vessels continuing to sail would likely face fates similar to those of the *Diamond Princess*, *Grand Princess*, and *MS Westerdam*. Their decision to sail the *Norwegian*

---

[38] Helderman et al., *supra*, note 34.

*Bliss*, let alone without undertaking reasonable and appropriate precautions after the outbreaks

on other ships, reflects a reckless disregard for the health and safety of all passengers and crew

on the *Norwegian Bliss*, not to mention the health of the communities to which the passengers

and crew returned.

      50.    A study conducted by the *Journal of Travel Medicine*, modeling the *Diamond*

*Princess* epidemic, reached some sobering conclusions about the danger of COVID-19 in close

quarters and how the quarantine was mishandled.[39] The rate of infection aboard the *Diamond*

*Princess* quadrupled that of Wuhan, China, revealing that if it was left unchecked, the disease

would have eventually touched 79% of those on board, or 2,900 people.[40] The study ultimately

concluded that the key factor for heightened spread was the ship itself.[41] Essentially, it is a

"floating petri dish[]" where "you've got passengers and crew members from different parts of

the world mixing intimately and intensely for a short period of time," said Dr. Sanjaya

Senanayake, an infectious diseases specialist at the Australian National University.[42]

      51.    Combine a space already vulnerable to the spread of infection with a novel, highly

contagious virus, and no stringent precautions in place, and the result jeopardized the health and

safety of thousands of passengers and crew. In short, the *Norwegian Bliss* never should have set

sail on March 8, 2020. NCLB and NCLH never should have forced passengers to choose

between their safety and their deposits.

      52.    NCLB and NCLH should not have continued business as usual aboard the

*Norwegian Bliss* after it did set sail. But despite knowledge of various COVID-19 outbreaks on

---

[39] J. Rocklöv et al., *COVID-19 Outbreak on the Diamond Princess Cruise Ship: Estimating the Epidemic Potential and Effectiveness of Public Health Countermeasures*, J. Travel Med. (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7107563/pdf/taaa030.pdf.

[40] *Id.*

[41] *Id.*

[42] Yvette Tan, *Coronavirus: Are Cruise Ships Really 'Floating Petri Dishes'?*, BBC News (Feb. 12, 2020), https://www.bbc.com/news/world-asia-51470603.

other vessels and the acute danger of rapid spread in close quarters, the *Norwegian Bliss* continued to host, promote, and push events and activities for passengers. Given that *Norwegian Bliss*'s March 8 departure date came after several outbreaks aboard cruise vessels, NCLB and NCLH had both warning and opportunity to adapt to the dangers posed by COVID-19 rather than to expose their passengers to the risks inherent in operating as usual.

**D.     Plaintiffs' Experience Aboard the *Norwegian Bliss***

53.     The *Norwegian Bliss* departed New York City on March 8, 2020, despite evidence and industry knowledge of numerous prior voyages that experienced early outbreaks. On March 6, 2020, Norwegian had sent its passengers a letter, assuring them of "the most robust measures in place to protect our guests and team members," including "extensive cleaning and disinfection protocols," and "health screenings of passengers and crew members."

54.     The March 6, 2020, Norwegian letter also described the "*Peace of Mind* policy," which allowed passengers on any voyage from March 10, 2020 through September 30, 2020 to cancel anytime up to 48 hours in advance of embarkation and receive a full refund in the form of credit toward any sailing that embarks through December 31, 2022. The *Norwegian Bliss*, however, embarked March 8, two days before the policy went into effect. Defendant did not apply its Peace of Mind policy to *Norwegian Bliss* passengers.



March 6, 2020

Dear Valued Guests and Travel Partners,

To provide you with peace of mind, I want to take this opportunity to personally update you on what we are doing at Norwegian Cruise Line to help ensure you have a safe, healthy and happy vacation experience with your friends and family.

As you know, the safety and well-being of our guests and team members are our number one priority.  We have a Chief Medical Officer on staff as well as dozens of medical professionals throughout our fleet, and we continue to consult with The World Health Organization (WHO) and the U.S. Centers for Disease Control and Prevention (CDC) to make the best decisions possible and take appropriate action as needed. We are very proud of the protocols and preventative measures we have in place to deal with current concerns regarding COVID-19, and I firmly believe that we have some of the most robust measures in place to protect our guests and team members.

In addition to extensive cleaning and disinfection protocols on board all voyages and health screenings of passengers and crew members, we have been denying boarding to guests who have traveled from, visited or transited via high risk areas; and we have modified several sailings to avoid areas of concern. At the current time, our plans are to avoid any area that is denoted as a 'Level 4 - do not travel' area by the State Department at the time of voyage.  We will modify any itinerary visiting those areas approximately 30 days prior to arrival date to avoid last minute changes.  As always, we will continue to monitor all State Department advisories and take appropriate action as necessary. For all our policies and procedures, please visit www.ncl.com.

Additionally, I want to provide our guests and travel partners with reassurance, so I am very pleased to announce our new *Peace of Mind* policy.  Simply put, for any voyage from March 10, 2020 through September 30, 2020, guests are free to cancel anytime up to 48 hours in advance of embarkation. Please note that this new policy applies to individual and group bookings only. Anyone choosing to cancel will receive a full refund in the form of a future cruise credit to be used for sailings that embark through December 31, 2022.  This is by far the most consumer-friendly policy in the industry. We put our guests first!

On a more personal note, I want to share that I am travelling with my family and friends to Europe in late May aboard one of our fantastic ships. Cruising is a fun and safe means of travel, and I want to ensure that you know that we walk the talk. I hope you will join me in exploring the world in the safety and comfort of an amazing Norwegian Cruise Line ship with your friends and family.

55.    Plaintiffs Megan and Diane Murphy would have used the "*Peace of Mind* policy"

and rescheduled their trip. But because NCLB and NCLH's Peace of Mind policy did not apply

to passengers embarking on trips before March 10, they felt they had no choice but to continue as

planned. The Murphy's later discovered the vessel was far from safe and that protection

measures were nonexistent—instead, the ship was a health risk and prime breeding grounds for

the deadly virus.

56.    Plaintiffs Megan and Diane Murphy, mother and daughter, arrived at the pier and boarded the *Norwegian Bliss* without medical screening. They were not asked any health questions or tested for a fever, and they did not observe any medical screening of others who boarded the *Norwegian Bliss*.

57.    On board, NCLB and NCLH operated the cruise as usual. The unscreened passengers were able to attend musicals, gamble, share communal meals, use the fitness center and aqua park, go to bars and lounges, and use the water slides and pools, without social distancing or personal protective equipment—even as the virus spread on the ship.

58.    Reasonable and appropriate cleaning measures were not implemented. Rather, the ship simply had signs advising passengers to wash their hands frequently and asked passengers to sanitize their hands before leaving the restroom or entering the main dining room. There were no apparent attempts to improve sanitation at the pool a CDC inspector had to close immediately upon inspection the prior year or even to make hand sanitizer available at high-touch areas like gambling rooms and bars. On information and belief, Norwegian no made effort to enhance its cleaning procedures to protect passengers from a deadly virus, known to spread rapidly in tight cruise quarters.

59.    Additionally, as the vessel left New York, and made its way to the Bahamas, there was no mention of COVID-19 by staff or crew to passengers. On March 10, the vessel docked in Port Canaveral near Orlando, Florida, which was one of the scheduled stops on the itinerary, but passengers were unable to disembark. There was discussion and worry amongst passengers that this could be due to COVID-19 concerns. The crew aboard the *Norwegian Bliss* ignored the collective worry associated with the virus's potential impact on porting, blaming it solely on rough waters. Perhaps that is true or perhaps, like other cruise ships that had been turned away

from ports, the *Norwegian Bliss* was turned away due to fear of COVID-19. Regardless, staff and crew on the *Norwegian Bliss* swept COVID-19 concerns under the rug, as if a global health pandemic with life threatening potential was no cause for concern.

60.    The day after the cruise ended on March 15, 2020, Plaintiff Megan Murphy fell ill. She became fatigued, suffered back pain and body aches, loss of her sense of taste and her sense of smell, and then experienced difficulty breathing—all symptoms of a COVID-19 infection. Notably, she is a diagnosed diabetic, which places her in the high-risk category for serious complications for COVID-19 infection, resulting in a higher chance of complications and long-term side effects.[43] Thus, when Plaintiff Megan Murphy contracted COVID-19 aboard the *Norwegian Princess*, she also suffered serious emotional distress.

61.    On March 16, 2020, Norwegian sent a letter to passengers on the March 8 cruise, explaining that a two-year-old on a March 1 voyage aboard the *Norwegian Bliss* had been diagnosed with COVID-19. The CDC instructed NCLB and NCLH to inform passengers, but the Defendants took no further action and made no attempt to monitor, trace, or follow up with passengers or crew to mitigate the spread of COVID-19.

---

[43] *Diabetes and Coronavirus (COVID-19): How COVID-19 Impacts People with Diabetes*, Am. Diabetes Assoc., https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-diabetes (last visited Mar. 12, 2021).



March 16, 2020

3/8/20 Norwegian Bliss voyage

Dear Valued Guest:

The safety and security of our guests and crew are at all times our first priority.  You are receiving this communication because our records indicate that you were a passenger on the March 8, 2020 voyage of Norwegian Bliss.  Norwegian Cruise Line has been provided information by the Centers for Disease Control and Prevention (CDC) that a two year old who traveled aboard the vessel on the March 1, 2020 voyage of the Norwegian Bliss tested positive for COVID-19.  At this time we are aware of no other similar cases from this voyage or the March 8, 2020 voyage.  However, in an abundance of caution, the CDC has asked that we forward the attached to you for your review and consideration.

We thank you for your continued support and look forward to welcoming you aboard a Norwegian Cruise Line vessel in the near future.

Sincerely,


Norwegian Cruise Line


62.     Overall, the lethal nature of the pandemic was established in the press by the time the *Norwegian Bliss* set sail. With lack of precautions and no stringent sanitization measures in place aboard the *Norwegian Bliss*, Defendants put Plaintiffs in actual physical danger of contracting a deadly virus. The Defendants chose to reap additional revenue at the expense of passengers and crew, who were left trapped on a vessel teeming with a deadly virus.

## V.     CLASS ACTION ALLEGATIONS

63.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiffs bring this action on their behalf and on behalf of all others similarly situated. The proposed class

that Diane and Megan Murphy seek to represent is defined at this time as: All passengers who

departed from New York, New York on the *Norwegian Bliss* on March 8, 2020.

64.    Excluded from the Class are Norwegian's officers, directors, and employees; the

judicial officers and associated court staff assigned to this case; and the immediate family

members of such officers and staff. Plaintiffs reserve the right to amend the Class definition

based on information obtained in discovery.

65.    This action satisfies the requirements of numerosity, commonality, typicality,

adequacy, predominance and/or superiority.

66.    **Numerosity**: The members of the Class are so numerous that joinder of all

members would be impractical. Upon information and belief, the *Norwegian Bliss* has a capacity

of 4,004 passengers and held in excess of 1,500 passengers at the time of its departure on March

8, 2020 from New York, New York. The precise number of class members can be ascertained

through discovery, which will include Norwegian's records. The members of the class are

readily identifiable from information in the possession, custody, and control of Norwegian. The

individual joinder of all passengers would be impractical such that a class action is more

practical and efficient.

67.    **Commonality and Predominance**: Common questions of law and fact

predominate over any questions affecting only individual members of the Class. For Plaintiffs

and the proposed Class, common legal and factual questions include, but are not limited to the

following:

        a.    Defendants' knowledge of the risks associated with the novel coronavirus

           and COVID-19, when Defendants became aware of the risks of the

coronavirus and COVID-19, and Defendants' decision-making process with respect to the risks associated with coronavirus and COVID-19;

b. Defendants' knowledge of the risk of the spread of a contagion aboard a cruise ship, including Defendants' past experience with the spread of contagion aboard a cruise ship;

c. Whether Defendants adequately considered the risks of COVID-19 transmission in deciding to sail the *Norwegian Bliss* on March 8, 2020, in light of their knowledge of the novel coronavirus and/or COVID-19 and the risk of contagion;

d. Whether Defendants should have canceled the voyage of the *Norwegian Bliss* departing on March 8, 2020 to avoid exposing passengers to the novel coronavirus and/or COVID-19 and in light of the risk of contagion;

e. Whether Defendants timely and adequately warned passengers aboard the *Norwegian Bliss* voyage departing on March 8, 2020 of the novel coronavirus, COVID-19, and the associated risk of contagion;

f. Whether Defendants had a duty to disclose to passengers aboard the *Norwegian Bliss* voyage departing on March 8, 2020 the risk of contracting the novel coronavirus, COVID-19, and the associated risk of contagion;

g. Whether the risk of contagion constituted a material fact that reasonable passengers/consumers would have considered in deciding whether to take the *Norwegian Bliss* voyage on March 8, 2020;

h.  Whether Defendants knew or should have known that crew aboard the *Norwegian Bliss* were potential carriers of the novel coronavirus;

i.  Whether Defendants had a duty to decontaminate the *Norwegian Bliss* prior to the initiation of the March 8, 2020 voyage;

j.  Whether Defendants took adequate precautions during the voyage of *Norwegian Bliss* commencing on March 8, 2020 to prevent the spread of contagion on board the vessel, including with respect to food service, entertainment, quarantine, and the management of the cruise services and decontamination of the vessel during the voyage;

k.  Whether Defendants provided Plaintiffs and the Class with adequate protections, information, and health care during the voyage of *Norwegian Bliss* commencing on March 8, 2020;

l.  Whether Defendants acted reasonably in the conduct of the *Norwegian Bliss* voyage departing on March 8, 2020, including with respect to the diversion of the itinerary and efforts to obtain safe passage home for passengers;

m.  Whether Defendants are the alter egos and/or agents of each other;

n.  Whether Defendants are liable for the conduct alleged in this Complaint;

o.  Whether, because of Defendants' acts and omissions, Plaintiffs and the Class members have suffered damages; and if so, the appropriate amount thereof; and

p.  Whether Defendants' conduct warrants the imposition of punitive damages.

68.     **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the Class were passengers on the *Norwegian Bliss* voyage departing on March 8, 2020 and have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class, the facts of Defendants' misconduct are common to all Class members, and Plaintiffs' claims are based on the same legal theories. Plaintiffs and all Class members have been injured by this course of conduct, suffered significant damage, including emotional distress and economic damage.

69.     **Adequacy**: Plaintiffs will fully and adequately assert and protect the interests of the Class and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

70.     **Superiority**: A class action is superior to all other available methods of the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable.

71.     While the aggregate damages sustained by the Class are likely to be in the millions of dollars, the individual damages incurred by each Class member do not warrant the expense of individual suits. Most Class members would find the cost of litigating their claims prohibitively expensive and would not have a cost-effective remedy at law.

72.     Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and the court system because of multiple trials of the same factual and legal

issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

73.    Defendants have access to addresses and/or other contact information for the members of the Class, which may be used to provide notice of the pendency of this action.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Negligence

74.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

75.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

76.    Defendants owed Plaintiffs and the Class a duty of reasonable care under the circumstances.

77.    Defendants knew or should have known that cruise ships pose a severe and increased risk of viral outbreak. Defendants knew or should have known that other cruise ships had already been sites of lethal outbreaks of COVID-19.

78.    Defendants breached their duty of reasonable care under the circumstances and were negligent in one or more of the following:

      a.  Failing to provide reasonable care to provide a safe voyage;

      b.  Failing to screen or medically examine any passengers or crew prior to boarding;

      c.  Failing to warn passengers of the particular risks of the coronavirus aboard the vessel;

      d.  Failing to provide adequate medical supplies and personnel;

e.  Failing to adequately disinfect, clean, or sanitize the vessel;

f.  Failing to implement adequate measures to contain the spread of COVID-19;

g.  Failing to have an emergency plan to ensure the health and safety of passengers in case of a viral outbreak;

h.  Failing to have an emergency plan to disembark passengers in the case of a viral outbreak; and

i.  Other acts or omissions constituting a breach of the duty of reasonable care under the circumstances which may be revealed through discovery.

79.    As a direct and proximate result of Defendants' breach of their duty, Plaintiffs and the Class suffered harm.

80.    As a direct and proximate result of Defendants' breach of their duty, Plaintiff Megan Murphy became infected with COVID-19. As a direct and proximate result of Defendants' breach of its duty, Plaintiffs and the Class were exposed to actual risk of physical injury. As a direct and proximate result of the Defendants' breach of its duty, Plaintiffs and the Class have suffered and continue to suffer severe emotional distress. After Plaintiffs and the Class were trapped on a vessel teeming with a deadly virus, they will continue to suffer and require medical services not part of the effects of daily life. The injuries and damages are permanent or continuing in nature.

81.    As a result, the Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## Gross Negligence

82.     Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

83.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

84.     Defendants owed Plaintiffs and the Class a duty of reasonable care under the circumstances. Defendants' conduct—operation of a cruise like it was business as usual, rather than a global pandemic in which other cruises resulted in the death of passengers—was an extreme departure from reasonable care. Insistence on continuing with the cruise, coupled with failure to provide adequate sanitation, medical care, or an emergency plan in the event of what was then a likely outcome demonstrated lack of even a semblance of care.

85.     As a direct and proximate result of Defendants' extreme departure from reasonable care under the circumstances, Plaintiffs and the Class were constantly at risk of severe infection and possibly death.

86.     As a direct and proximate result of Defendants' extreme departure from reasonable care under the circumstances, Plaintiff Megan Murphy became infected with COVID-19.

87.     As a direct and proximate result of Defendants' extreme departure from reasonable care under the circumstances, Plaintiffs and the Class suffered severe emotional distress.

88.     As a result, the Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

89.     Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

90.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

91.     Due to the negligence and/or gross negligence of the Defendants, Plaintiffs and the Class were in the "zone of danger," or at immediate risk of actual physical harm.

92.     Due to the risk of physical injury caused by the negligence and/or gross negligence of the Defendants, Plaintiffs and the Class suffered severe mental and/or emotional harm, including, but not limited to fear, grief, anxiety, shock, and humiliation stemming from the danger of contracting COVID-19 themselves. Plaintiffs and the Class were forced to suffer additional harm including, but not limited to fear, grief, anxiety, shock, and humiliation stemming from witnessing the danger to their family members and fellow passengers of contracting COVID-19. This fear, grief, anxiety, shock, and humiliation in turn had physical manifestations, including, but not limited to insomnia, depression, and anxiety.

93.     The injuries and damages are permanent or continuing in nature. As a result of being trapped on a vessel teeming with a deadly virus, Plaintiffs and the Class will continue to suffer and require medical services not part of the effects of daily life.

94.     As a result, the Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

95.     Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

96.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

97.     Defendants knew or should have known that there was a heightened risk of a deadly outbreak of COVID-19 on cruise ships given: the state of the global pandemic; guidelines, protocols, and recommendations from public health experts and the cruise industry; and well publicized COVID-19 outbreaks on other cruise ships.

98.     Given its knowledge and firsthand experience, Defendants' failure to have effective measures to medically screen for, examine, or treat COVID-19 symptoms was extreme and outrageous conduct.

99.     Given its knowledge and firsthand experience, Defendants' failure to have effective procedures to clean, sanitize, or disinfect the ship in case of viral contagion was extreme and outrageous conduct.

100.    Given its knowledge and firsthand experience, Defendants' failure to have an emergency plan for containing the spread of the virus and/or for disembarking either infected or uninfected passengers or crew in case of viral contagion was extreme and outrageous conduct.

101.    The Defendants' extreme and outrageous conduct had already sickened at least one passenger on a *Norwegian Bliss* cruise prior to the March 8 voyage. To continue business as usual, and even deny a refund to passengers who wanted to postpone or cancel their trip in light of the spread of COVID-19, was to act with reckless disregard of the health and safety of Plaintiffs and the Class and the probability that Plaintiffs and the Class would suffer severe emotional distress. This is particularly so in light of the Norwegian's recognition of the seriousness of the risk of Covid-19 infection as evidenced by its permitting customers who had booked passage on voyages commencing only two days after March 8 to cancel.

102.    As a direct and proximate result of Defendants' intentional and reckless conduct, Plaintiffs and the Class suffered severe or extreme emotional distress including but not limited to fear, grief, anxiety, shock, and humiliation.

103.    The injuries and damages are permanent or continuing in nature. As a result of being trapped on a vessel teeming with a deadly virus, Plaintiffs and the Class will continue to suffer and require medical services not part of the effects of daily life.

104.    As a result, the Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendants, and each of them, as follows:

1. An order certifying the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), designating Plaintiffs as named representatives of the Class, and appointing the undersigned attorneys as Class Counsel under Federal Rule of Civil Procedure 23(g);

2. An order providing the following injunctive relief to promote the health and safety of current and future cruise passengers:

   a. Requiring Defendants to provide truthful, publicly available, and real-time information in an online dashboard (similar to those provided by state departments of health) to passengers and crew on all of Defendants' affiliated ships:

      i. The dashboard shall provide all material information relating to the health and safety of passengers and crew, including, but not limited to COVID-19, norovirus, or other viral cases and exposure. This data shall be

provided two months before a cruise, updated a week before a cruise, updated the day of the cruise, updated during the cruise, and updated for two months after the conclusion of any sailing in the event passengers are diagnosed following disembarkation;

ii. In the event of one or more confirmed COVID-19, norovirus, or other viral cases or exposure during a cruise, passengers and crew shall be promptly notified in writing regarding the material facts of the diagnosis or exposure, including, but not limited to data to allow for reasonable contact tracing.

b. Requiring Defendants to implement testing, facial masking, physical distancing, disinfecting, and sanitizing protocols and to adhere to all WHO, CDC, and other applicable health and safety guidelines.

c. Requiring Defendants to promptly advise, quarantine, and disembark passengers as soon as Defendants become aware of COVID-19, norovirus, or other viral cases and exposure.

d. Requiring Defendants to terminate cruises and to provide refunds and safe, prompt returns to passengers as soon as a cruise becomes unreasonably dangerous.

3. An award of damages including, but not limited to compensatory damages for Plaintiffs' and the Class Members' injuries, including physical and emotional pain and suffering, financial damages, and any other damages allowed by law, in an amount to be proven at trial;

4.  An award of the costs of Plaintiffs' and the Class's ongoing medical and diagnostic treatment required to diagnose, prevent, and/or treat current or future mental and physical injuries related to Plaintiffs' and Class Members' contraction of and exposure to COVID-19;

5.  An award of attorneys' fees and costs, as allowed by law;

6.  An award of pre-judgment and post-judgment interest, as provided by law;

7.  Leave to amend this Complaint and other Plaintiffs' pleadings to conform to the evidence produced at trial; and

8.  For such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims and of all issues so triable.


DATED:  March 12, 2021
        New York, New York

                    **KELLER ROHRBACK L.L.P.**


                    By *s/ David S. Preminger*
                        David S. Preminger (DP1057)
                        dpreminger@kellerrohrback.com
                        1140 Sixth Avenue, 9th Floor
                        New York, NY 10036
                        Telephone: (646) 380-6690
                        Facsimile: (646) 380-6692

                        Alison E. Chase (*pro hac vice* forthcoming)
                        achase@kellerrohrback.com
                        801 Garden Street, Suite 301
                        Santa Barbara, CA 93101
                        Telephone: (805) 456-1496
                        Facsimile: (805) 456-1497

                        ***Attorneys For Plaintiffs***